## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ann Marie Bowen,                                    Civ. No. 13-2559 (PJS/JJK)

      Plaintiff,

v.                                                      **REPORT AND**
                                                        **RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

      Defendant.

---

Carol Louise Lewis, Esq., Carol Lewis, Attorney at Law, counsel for Plaintiff.

Ann M. Bildtsen, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Ann Marie Bowen seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability insurance benefits and supplemental security income.  This matter is before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 13 and 17), for a Report and Recommendation pursuant to 28 U.S.C. § 636(c) and D. Minn. LR 72.1.  For the reasons stated below, this Court recommends granting Plaintiff's motion for summary judgment by remanding to the Commissioner for further proceedings, and denying Defendant's motion for summary judgment.

**SUMMARY**

After the ALJ denied Plaintiff's application, a neuropsychologist administered intelligence tests for Plaintiff which revealed that Plaintiff has a full scale I.Q. of 77, a low I.Q. score consistent with borderline intellectual functioning.  (Tr. 395.)[1]  Moreover, the neuropsychologist's report indicated that Plaintiff's verbal comprehension fell within only the third percentile, and her sustained attention and concentration test results placed her in the severely impaired range, at the .2 percentile.  (Tr. 395–96.)  Plaintiff's borderline intellectual functioning was not taken into account in the ALJ's determination that Plaintiff did not meet the criteria for disability benefits, despite the fact that the ALJ acknowledged at the hearing that the vocational expert thought it would be helpful to have Plaintiff's I.Q. scores, and the ALJ considered ordering I.Q. tests but ultimately did not do so.  We recommend that this matter be remanded so that full consideration may be given to the impact of the neuropsychological evaluation on Plaintiff's claim for disability.

**BACKGROUND**

**I.    Procedural History**

Plaintiff filed applications for disability insurance benefits and supplemental security income in February 2011, alleging a disability onset date of February 1,

---

[1]    Throughout this Report and Recommendation, reference to the Administrative Record (Doc. No. 8) for this case is made by using the abbreviation "Tr."

2009.  (Tr. 128–55.)  The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.  (Tr. 61–67, 70–76.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on June 22, 2012.  (Tr. 77–78, 28–51.)  On July 27, 2012, the ALJ issued an unfavorable decision on Plaintiff's applications.  (Tr. 10–27.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on July 24, 2013.  (Tr. 1–6.)  Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

## II.    Functional Reports

Plaintiff, born on October 10, 1973, was 35 years old on her alleged onset date of disability, February 1, 2009.  (Tr. 128.)  As a child, Plaintiff struggled academically, and she dropped out of high school when she became pregnant. (Tr. 235.)  Two years later, she completed schooling at Brainerd Area Learning Center, an alternative school.  (Tr. 235, 395.)  She also completed nurse assistant training but did not pass the hands-on test to become certified. (Tr. 394.)  She most recently worked as a housekeeper at a casino, from January 2007 through January 2009.  (Tr. 185, 394.)  She quit working as a housekeeper in February 2009, alleging disability from PTSD, OCD, depression, anxiety, memory impairment, learning disability, and borderline personality disorder. (Tr. 184–85.)

Plaintiff completed a function report for the SSA on February 24, 2009. (Tr. 172–79.) She reported that she had difficulty following instructions and remembering. (Tr. 172.) She spent her days caring for her children and doing housework. (Tr. 173–74.) She was capable of handling money and shopping. (Tr. 175.) She frequently read, made crafts, talked on the phone, and chatted on the computer. (Tr. 176.) She could pay attention for one hour. (Tr. 177.) She reported that she could follow written, detailed instructions, as well as short, simple spoken directions, but she did not handle stress or changes in routine well. (Tr. 178.)

Plaintiff's husband completed a third party function report on February 27, 2011. (Tr. 202–09.) He reported that Plaintiff had short term memory loss. (Tr. 202.) He stated that Plaintiff did housework, cooked, watched television, made crafts, and talked to others using her phone and computer. (Tr. 203–06.) He reported that Plaintiff could pay attention for about one hour, and she did not sleep well or handle stress or changes in routine well. (Tr. 203, 207, 208.)

Plaintiff completed an updated function report for the SSA on September 19, 2011. (Tr. 219–26.) She reported that her memory was poor and it was hard for her to concentrate, and when her work performance was questioned, it caused her to shut down. (Tr. 219.) She indicated that her typical day included getting her children off to school, going back to bed, and spending the rest of her time making crafts and cooking dinner. (Tr. 220.) She stated that her husband helped with the housework and with the children, and that stress at

home caused her to shut down and go to her room.  (Tr. 220, 225.)  In addition,

she stated that if her routine was interrupted, it made her angry and irritated.

(*Id.*)

## III.   Medical Records Before the Alleged Disability Onset Date

Plaintiff underwent a consultative psychological examination with

Dr. Andrew Thompson on July 10, 2006, in support of an earlier application for

Social Security disability benefits.  (Tr. 240–43.)  At that time, she worked part-

time as a housekeeper at a hotel, and she was applying for disability based on

depression.  (Tr. 240.)  She had lost her Medical Assistance and was unable to

afford Paxil, so she was off antidepressants.  (*Id.*)  She was not suicidal but

suffered anxiety attacks.  (*Id.*)  Based on her mental status examination, Plaintiff

appeared to be functioning in the low average intellectual range.  (Tr. 242.)

Dr. Thompson diagnosed Plaintiff with major depressive disorder, and assessed

a GAF score of 58.[2]  (Tr. 243.)  He opined that Plaintiff could understand,

remember, and follow simple instructions; sustain attention and concentration to

---

[2]      The Global Assessment of Functioning Scale (GAF), a scale of 0 to 100, is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults.  *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-tr*) 32 (American Psychiatric Association 4th ed. text revision 2000). Scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* at 34.  Scores between 41 and 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*  Scores of 31-40 indicate some impairment in reality testing or communication or major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id.*  The GAF scale was excluded from the latest edition of the DSM.  *See DSM-V* (American Psychiatric Association 5th ed. 2013).

carry out work-like mental tasks with persistence and pace; and tolerate the stress of the competitive workplace.  (*Id.*)

Plaintiff was treated by Dr. Matt Gervais at Brainerd Medical Center. (Tr. 245–50.)  On May 6, 2008, Dr. Gervais noted that he had seen Plaintiff for depression and anxiety one year earlier, and he had prescribed Paxil.  (Tr. 245.) However, Plaintiff discontinued the medication after three months.  (*Id.*)  Her present symptoms were irritability, depressed mood, poor appetite, poor energy, and difficulty sleeping.  (*Id.*)  She appeared slightly anxious, and her affect was flat.  (*Id.*)  Dr. Gervais prescribed citalopram, an antidepressant drug (*Id.*)

When Plaintiff returned to Dr. Gervais on September 16, 2008, she reported going to an emergency room four times when she had anxiety attacks. (Tr. 249.)  She had been treated with Klonopin, which helped but caused fatigue. (*Id.*)  She was not overly anxious on examination.  (*Id.*)  Dr. Gervais increased her citalopram and prescribed lorazepam, an anxiety medication.  (*Id.*)  The medications were helpful, and Plaintiff was doing better in early November 2008. (Tr. 250.)

On November 21, 2008, Plaintiff had thoughts of suicide and was admitted to Grace Unit at St. Joseph's Medical Center on a 72-hour hold.  (Tr. 254–56.)  At that time, Plaintiff reported being under stress because she feared losing custody of her two children, although she did not say why.  (Tr. 255.)  She had already lost legal custody of her oldest child.  (*Id.*)  While hospitalized, Plaintiff had a CT

scan of her brain to evaluate her complaints of memory loss.  (Tr. 261.)  The results of the scan were negative.  (*Id.*)

## IV.   Medical Records After the Alleged Disability Onset Date

Plaintiff sought to establish care with Dr. Elizabeth McCurdy at Roosevelt Family Medicine on October 19, 2009.  (Tr. 274–76.)  Plaintiff reported being on various medications for depression in the past, most recently Effexor, but she said none of the medications helped.  (Tr. 274.)  After being off Effexor for two months, she had frequent crying spells.  (*Id.*)  She reported that she was tired and had no desire to do anything.  (*Id.*)  She also had migraine headaches almost daily.  (Tr. 275.)  Dr. McCurdy prescribed the drug amitriptyline for depression, insomnia, and headaches.  (*Id.*)

On September 2, 2010, Plaintiff underwent a psychological evaluation with therapist Scott Hanson at Children & Families of Iowa, a social service organization.  (Tr. 285–95.)  Hanson diagnosed Plaintiff with major depressive disorder, recurrent and mild; generalized anxiety disorder; and personality disorder, NOS, and he assessed a GAF score of 58.  (Tr. 287.)  Objective findings from Plaintiff's mental status examination were the following: quiet and slowed speech; depressed mood; blunted and flat affect; below average intellectual functioning; easily distracted; immediate recall deficit; and poor insight, judgment, and impulse control.  (Tr. 288.)  Plaintiff reported that she was stressed from fighting with her children, who were thirteen and fifteen years old.  (Tr. 289, 294.)  She also stated that when she did not want to deal with her

problems, she locked herself in her room.  (Tr. 289.)  In addition, Plaintiff had difficulty sleeping, and she was fatigued, lethargic, and had little interest in things.  (*Id.*)  She stated she was not suicidal, and she said she had a learning disability.  (Tr. 290, 293.)  Hanson determined that Plaintiff required services to stabilize her mental health and improve family relations.  (Tr. 295.)

On March 11, 2011, Plaintiff underwent an evaluation with Dr. James Wook Kim at Penn Mental Health Clinic in Des Moines, Iowa.  (Tr. 297–98.)  At the time, her symptoms were depression and anxiety with obsessive symptoms of rearranging furniture and "checking."  (Tr. 297.)  She also described reliving traumatic events of the past, including abuse by her ex-husband.  (*Id.*)  With the exception of depressed mood and restricted affect, her mental status examination was normal.  (*Id.*)  Dr. Kim diagnosed Plaintiff with major depression, and assessed a GAF score of 40.  (*Id.*)  He also prescribed Lexapro, an antidepressant, and Ambien, a sleep medication.  (*Id.*)

The SSA referred Plaintiff for a consultative psychological evaluation with Dr. Lyle Wagner on July 5, 2011 because Plaintiff was applying for disability as a result of mental problems including depression, anxiety, obsessive compulsive disorder, short term memory problems, learning disabilities, and borderline personality disorder.  (Tr. 304–06.)  She told Dr. Wagner that she did not have any physical issues.  (*Id.*)  During the evaluation, Plaintiff reported the following. She graduated from high school in 1993, and she attended a community college three different times, without completing a specific program.  (Tr. 305.)  She last

worked as a housekeeper at Grand Casino Mille Lacs, and quit when she moved

to Iowa in January 2009.  (*Id.*)  Her hobbies were reading, making crafts, listening

to music, watching television, and playing solitaire.  (*Id.*)  She cooked and

performed household chores, sometimes with the help of her husband and

children.  (*Id.*)  She got along well with others, and her grooming and hygiene

were adequate.  (Tr. 306.)   She was cooperative, polite, and appeared relaxed.

(*Id.*)  Her speech and thought processes were normal.  (*Id.*)  She complained of

daily depression and poor sleep.  (*Id.*)  And at times, she felt irritable, angry and

cried.  (*Id.*)  She reported that her energy level was poor, she  felt anxiety daily,

and she obsessively rearranged her house.  (*Id.*)

     Dr. Wagner noted that Plaintiff's mood was of mild to moderate

depression.  (Tr. 307.)  She scored in the 37th percentile in a test of

concentration and attention, and she could not interpret a proverb.  (*Id.*)  Her

judgment was adequate, and her insight was fair.  (*Id.*)  Due to her inconsistent

responses in the mental status examination, Dr. Wagner found it difficult to

assess Plaintiff's cognitive functioning, although it was probably in the low

average range.  (*Id.*)  He recommended that Plaintiff be given the WAIS-IV test to

clarify her cognitive functioning.  (*Id.*)  He also noted that Plaintiff endorsed

various elements of borderline personality disorder.  (*Id.*)  Dr. Wagner diagnosed

Plaintiff with major depressive disorder, recurrent and moderate; anxiety

disorder, NOS; borderline personality disorder traits; and low average cognitive

functioning but ruled out borderline intellectual functioning.[3]  He also assessed a

GAF score of 55.  (Tr. 308–09.)

Dr. Wagner also found it difficult to assess Plaintiff's ability to understand

instructions without obtaining more information from intelligence testing.

(Tr. 307.)  He felt she might have some difficulty in persisting at a reasonable

pace to complete a particular task due to her level of depression and anxiety.

(Tr. 308.)  He also thought Plaintiff's depression and anxiety might cause

difficulty in managing stress and pressure in workplace.  (*Id.*)

On June 14, 2011, Plaintiff underwent an evaluation with Nurse Linda

Hertz at Northern Pines Mental Health, for the purpose of establishing care with a

new provider after moving from Iowa to Minnesota.  (Tr. 301–03.)  Plaintiff

reported that she had not been on any medications since moving to Minnesota in

April 2011, and she reported symptoms of depression and anxiety.  (Tr. 301.)

She was overweight but did not report any acute or chronic physical conditions.

(Tr. 302.)  Her mental status examination was normal, and she appeared to have

average intellectual ability, based on conversation.  (Tr. 302–03.)  Hertz

diagnosed Plaintiff with major depression and anxiety, NOS.  (Tr. 303.)  And she

assessed a GAF score of 50.  (*Id.*)

---

[3]     In the Diagnostic and Statistical Manual of Mental Disorders (DSM), borderline intellectual functioning is a "category that can be used when the focus of clinical attention is associated with . . . an IQ in the 71-84 range."  *DSM-IV-tr* at 740 (American Psychiatric Association 4th ed. text revision 2000).

Plaintiff saw Nurse Hertz again on July 5, 2011, and Plaintiff  reported that she was doing much better since she resumed her medication.  (Tr. 333.) Plaintiff's mental status examination was normal at that time.  (*Id.*)  In September 2011, Plaintiff's husband agreed that Plaintiff was doing better.  (Tr. 331.) Plaintiff reported that she had more energy, and she was happy with her medications.  (*Id.*)  Her mental status examination remained normal.  (*Id.*)

Plaintiff did not return to Nurse Hertz until February 2012, after she was off her medications for a few months because she could not afford the copayments. (Tr. 363–64.)  Hertz said that Plaintiff's judgment and insight were poor, her grooming and hygiene were "okay," and her mood and affect were depressed. (Tr. 363.)  Plaintiff agreed to resume her medications.  (Tr. 364.)

On February 16, 2012, Plaintiff again sought evaluation for depression at Northern Pines Mental Health Clinic.  (Tr. 365–67.)  She was evaluated by Robert Steele, a licensed psychologist.  (*Id.*)  She reported that she had poor communication with her family, stress, depression, and loss of interest in activities.  (*Id.*)  At the time, Plaintiff was caring for her disabled husband, her teenage daughter who had ADHD, and her son who had a physical disfigurement that caused him to be teased at school.  (Tr. 365.)  Plaintiff stated that she felt isolated, and demands from her children caused her anxiety.  (*Id.*)  Plaintiff reported that her husband and children spent their time watching television, and Plaintiff spent her days on a separate floor of the house.  (*Id.*)

Steele noted that Plaintiff appeared unkempt, with poor attention to grooming.  (Tr. 365.)  She also appeared uninterested and uninvolved.  (*Id.*) Steele noted that Plaintiff's speech was slow, and her thought process was somewhat circumstantial and irrelevant.  (*Id.*)  Her memory was impaired, and her insight was limited.  (*Id.*)  Steele diagnosed Plaintiff with recurrent major depressive disorder, and he assessed a GAF score of 31-40.  (Tr. 366.)  He recommended weekly therapy.  (*Id.*)  Plaintiff started therapy the following week. (Tr. 368.)  She reported that she had little interaction with her husband, and her children did not listen to her.  (*Id.*)  She said she felt powerless, and she lost interest in trying to change her situation.  (*Id.*)

On March 22, 2012, Plaintiff told her therapist that she found a place for her family to move, and she had been able to get her children to help with packing and chores.  (Tr. 370.)  She said she felt anxiety over moving, and it was affecting her sleep.  (*Id.*)  She reported that her son would be living with his grandmother for a trial period, and her  recent quality time with her family improved her mood.  (*Id.*)

On December 13, 2012, Plaintiff saw Dr. John Halfen at the Lakewood Clinic Health System seeking evaluation for daily headaches.  (Tr. 392.)  At that time, Plaintiff was taking her medications, Lexapro and amitriptyline, but she slept poorly at night and suffered frequent anxiety during the day.  (*Id.*)  Noting her congestion, Dr. Halfen believed Plaintiff's headaches were from her sinuses, not migraines.  (Tr. 392–93.)  He recommended treatment with a nasal steroid.

(Tr. 393.)  He also switched Plaintiff's antidepressant from Lexapro to Remeron, hoping it would help her sleep.  (*Id.*)

## V.  State Agency Consultants' Opinions

Dr. Janis Konke reviewed Plaintiff's Social Security disability file at the request of the SSA, and on July 20, 2011, completed a Psychiatric Review Technique Form and a Mental RFC Assessment form.  (Tr. 310–30.)  Dr. Konke opined that Plaintiff had mild restrictions in her daily activities, and moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace.  (Tr. 323.)  She opined that Plaintiff retained the mental capacity to concentrate on, understand, remember, and carry out routine, repetitive, three or four step uncomplicated instructions, she was limited to superficial contact with co-workers, and required a reasonably supportive supervisory style, with only routine stress.  (Tr. 329.)  Dr. Konke did not believe intelligence testing was required because Plaintiff's responses to mental status examinations were "relatively consistent since 2006."  (Tr. 325.)  Dr. James Alsdurf reviewed Plaintiff's Social Security disability file upon reconsideration of her claims on October 4, 2011, and he affirmed Dr. Konke's opinion.  (Tr. 335–37.)

### VI.  Evidence Submitted to the Appeals Council

On December 18, 2012, five months after the ALJ's unfavorable decision on Plaintiff's application, Plaintiff underwent a psychological evaluation with Dr. Tim Tinius, a licensed nueropsychologist (Tr. 394–404.)  Dr. Tinius noted that

Plaintiff was 39 years old, in her third marriage, and had three children, aged 20, 17, and 15. (Tr. 394.) Plaintiff's middle child lived with Plaintiff's parents, and her youngest child lived with Plaintiff and her husband. (*Id.*) Plaintiff's daily activities included cleaning, watching television, and talking to her husband. (*Id.*)

Dr. Tinius also noted that Plaintiff graduated from high school in 1993 and completed nurse assistant training but did not pass the hands-on test. (*Id.*) She struggled with algebra, but could add, subtract, multiply, divide, and read a newspaper or magazine. (*Id.*) Plaintiff was currently taking amitriptyline and Remeron. (*Id.*) She had a history of frequent headaches. (*Id.*) Plaintiff's first husband was abusive, and she had an appointment pending for evaluation of PTSD. (*Id.*) Her symptoms were depression, poor sleep, poor appetite, anxiety, poor concentration, and forgetfulness. (*Id.*) She had episodes of anger and irritability. (*Id.*) And she lost her train of thought during conversations. (*Id.*) During her visit with Dr. Tinius, Plaintiff was poorly groomed and wore dirty clothes. (Tr. 395.)

Plaintiff was given the WAIS-IV intelligence test and, according to Dr. Tinius, appeared to give her best effort in testing. (*Id.*) She obtained a full scale IQ score of 77, in the sixth percentile; her verbal comprehension was in the borderline intellectual functioning to mildly mentally retarded range, in the third percentile; her working memory was in the low average range; and she demonstrated below average processing speed, in the 14th percentile. (*Id.*) She was moderately impaired in reading comprehension, consistent with the level of a

twelve-year-old.  (*Id.*)  And her spelling and math skills were average.  (*Id.*)  The

profile suggested by Plaintiff's scores on tests of concentration and attention was

that of an inability to complete tasks that required sustained attention, focus, and

ability to remain on task.  (Tr. 396.)  Dr. Tinius noted that such a person could

complete tasks but responses often showed slow processing.  (*Id.*)  He also

noted that such a person's slow and inaccurate responses "result in a global

failure to maintain accuracy of response on tasks which are less than interesting

or boring."  (*Id.*)

Dr. Tinius also administered the MMPI-2 personality test, but the results

were invalid due to over reporting of severe psychopathology.  (*Id.*)  Dr. Tinius

diagnosed Plaintiff with cognitive disorder, NOS; depressive disorder, NOS;

ADHD, predominantly inattentive type; reading disorder; borderline intellectual

functioning; and personality disorder, NOS.  (Tr. 397.)  He assessed a GAF score

of 51-60.  (*Id.*)  Dr. Tinius noted that the test results confirmed Plaintiff's

complaints of difficulty learning and poor memory, and this was likely present

most of her life.  (*Id.*)

## VII.   Testimony at the Administrative Hearing

### (a) <u>Plaintiff's Testimony</u>

Plaintiff, represented by counsel, testified at a hearing before the ALJ on

June 22, 2012.  (Tr. 28–51.)  At the time of the hearing, Plaintiff lived with her

husband and daughter at a friend's house, waiting to move into a new home at

the end of the month because their previous home was foreclosed.  (Tr. 33.)

Plaintiff testified that she spent most of the time sitting by herself in her bedroom because she was depressed.  (*Id.*)  She would sometimes watch movies with her husband and children or talk to a friend.  (*Id.*)  She cried a few hours during the day and she had migraine headaches daily.  (Tr. 34.)  She stated that she only left the house for shopping.  (Tr. 34–35.)

Plaintiff did not have a driver's license.  (Tr. 35.)  She testified that she failed the driving part of the exam three times.  (*Id.*)  She also had a problem where she could not stop rearranging furniture in her home.  (Tr. 36.)  She had panic attacks, and she was told it was caused by depression and stress.  (*Id.*)  She stated that she could not put her stressors out of her mind.  (Tr. 37.)

Plaintiff also testified that she enjoyed her hobby of making crafts, but she no longer wanted to do anything else.  (*Id.*)  The slightest thing made her irritable and angry.  (Tr. 38.)  Plaintiff used to spend a lot of time texting or talking on her phone.  (*Id.*)  And she had also obsessively played games on her computer. (Tr. 39.)  But she no longer had a computer, and her depression now prevented her from doing anything, including housework.  (*Id.*)

### (b) Vocational Expert's Testimony

Dr. David Perry testified at the hearing as a vocational expert.  (Tr. 40–48.) Prior to the hearing, Dr. Perry prepared a Past Relevant Work Summary, finding that Plaintiff's past relevant work was consistent with the job of housekeeper, described in the Dictionary of Occupational Titles Code 323.687-014, as an

unskilled light job (medium as performed by Plaintiff) with a skill level ("SVP") of two.[4] (Tr. 234.)

The ALJ posed a hypothetical vocational question to Dr. Perry, asking him to assume a person who had Plaintiff's past relevant work and the following residual functional capacity:  able to lift 50 pounds on occasion, 25 pounds frequently; sit and stand and/or walk for six hours each per workday; mildly limited in activities of daily living; moderately limited, defined as limited to performing at the lower acceptable limits for most workplaces, in the following areas: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to interact appropriately or consistently with the general public, and respond to criticism or instructions from supervisors; (4) ability to adapt to changes in the normal work routine or the normal work setting; (5) limited to simple, routine, repetitive kinds of tasks involving no more than three to four steps; and (6) brief and superficial contact with other people. (Tr. 41–42.)  Dr. Perry testified that such a person could perform Plaintiff's past relevant work as a housekeeper.  (Tr. 42.)

---

[4]     The Dictionary of Occupational Titles uses the term "Specific Vocational Preparation" ("SVP") to categorize occupations.  *See*, Dictionary of Occupational Titles, Appendix C:  Components of Definition Trailer, available at http://www.occupationalinfo.org/appendxc_1.html#II  SVP is the amount of time required by a typical worker to learn a specific job.  *Id.*  An SVP of two encompasses jobs that require learning beyond a short demonstration up to and including one month of training.  *Id.*

The ALJ then added another limitation to the hypothetical question – that the person's anxiety caused marked limitation in concentration, persistence, or pace, occurring every day, unpredictably, and caused the person to be unproductive for fifteen to thirty minutes.  (*Id.*)  Dr. Perry testified that such limitations would preclude Plaintiff's past work and any full-time competitive work. (Tr. 42–43.)

The ALJ then added to the hypothetical question that the person was between 37 and 38 years old, has a high school education, and only a fair ability to read, write, and perform math.  (Tr. 43.)  This did not change Dr. Perry's opinion that prior work as a housekeeper would be precluded.  (*Id.*)

Plaintiff's counsel added to the hypothetical question the fact that the person would miss two or more days of work per month due to migraines and anxiety attacks.  (*Id.*)  Dr. Perry testified that such absences would not be tolerated in competitive employment.  (*Id.*)  Finally, Dr. Perry testified that a person performing unskilled work for an eight-hour day should not be off-task more than a half-hour total.  (Tr. 44–45.)

Plaintiff's attorney also asked Dr. Perry whether a person who had bilateral carpal tunnel syndrome and was limited to occasional handling could perform Plaintiff's past work as a housekeeper.  (Tr. 45.)  Dr. Perry testified that housekeeping required handling at a frequent level.  (*Id.*)  However, a person who could perform sedentary, unskilled work with only occasional handling could

perform jobs such as government clerk,[5] surveillance system monitor,[6] and credit clerk.[7]  (Tr. 46–47.)  Sedentary jobs such as government clerk and credit clerk would require basic math skills.  (Tr. 47.)  When asked whether a person who was at the borderline intellectual functioning level could handle such jobs, Dr. Perry said that he could not say without knowing the specifics of the IQ scores of the person.  (Tr. 47–48.)  The ALJ then said that he might order an IQ test if there was evidence that Plaintiff had special education.  (*Id.* at 49–50.)  ("And then I'll take a look at it, at that point, and see if I want to order additional testing before I make a decision.")  After the hearing, Plaintiff's attorney sent the ALJ a letter informing the ALJ that Plaintiff dropped out of high school after two years and finished her education at an area education center attended by students who have dropped out of high school where she took courses that were not academically challenging but were not identified as special education courses.  (Tr. 235.)  The ALJ did not order IQ tests.

## IV.  The ALJ's Findings and Decision

On July 27, 2012, the ALJ issued a decision concluding that Plaintiff was not under a disability, therefore denying Plaintiff's application for benefits.  (Tr. 10–22.)  The ALJ followed the five-step evaluation set out in the Code of

---

[5]     *See* DOT Code 205.367.030, with 1,200 such jobs in the region.

[6]     *See* DOT Code 379.367-010, with 72,000 such jobs in the region.

[7]     *See* DOT Code 237.367-014, with 1,200 such jobs in the region.

Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (summarizing the five-step evaluation process).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 1, 2009. (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairments: obsessive-compulsive disorder, post-traumatic stress disorder, depression, anxiety, borderline personality disorder, and learning disability.  (*Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).)

At step three, the ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15–16.)  Specifically, she did not meet the "B criteria" of Listing 12.04 for affective disorders or 12.06 for anxiety-related disorders.  (Tr. 15–16.)  The ALJ concluded that Plaintiff had only mild restrictions in activities of daily living because she could cook for her family and perform most of the household chores.  (Tr. 16.)  And in social functioning, the ALJ found that Plaintiff had moderate difficulties because she isolated herself. (*Id.*)  The ALJ also concluded that Plaintiff had moderate difficulties in concentration, persistence, or pace, and she had difficulty with memory, particularly when under stress.  (*Id.*)  However, the ALJ noted that Plaintiff had sufficient concentration to read, make crafts, listen to music, watch television, and play computer games.  (*Id.*)  Concerning episodes of decompensation, the ALJ noted that although Plaintiff had a psychiatric hospitalization in November

2008, it was before her alleged onset of disability.  (*Id.*)  And she did not have

any episodes of significant and sustained loss of adaptive functioning during the

relevant time period.  (*Id.*)  The ALJ also found that the "C" criteria of Listing

12.04 was not satisfied.  (*Id.*)

At step four of the evaluation, the ALJ found that Plaintiff had the RFC to

perform:

> medium work, as defined in 20 CFR 404.1567(c) and 416.967(c).
> She can do so within limits, as follows:  She is able to lift and carry
> 50 pounds occasionally and 25 pounds frequently.  She is able to sit
> for 6-hours in an 8-hour workday.  She is able to stand and/or walk
> 6-hours in an 8-hour workday.  The claimant has established no
> other physical limitations.  The claimant has moderate limitations in
> social functioning and maintaining concentration, persistence, or
> pace.  The term "moderate" as used herein and defined for the
> vocational expert at the hearing, means affected, not precluded,
> such that performance is at the lower acceptable limits for most
> workplaces.  As defined, she has moderate limitations in her ability
> to interact appropriately with the public and respond to criticism or
> instruction from supervisors.  She also has moderate limitations in
> her ability to adapt to changes in a normal work routine or work
> setting.  She is limited to simple, routine, repetitive tasks, involving
> no more than 2 to 4 steps on average, and should have only brief,
> superficial contact [with] others.

(Tr. 17).  In making the RFC determination and assessing the severity of

Plaintiff's subjective complaints, the ALJ considered Plaintiff's testimony and

several credibility factors.  (*Id.*)  The ALJ noted that Plaintiff testified that she

suffered anxiety and depression since age seventeen, she had frequent crying

spells and isolated herself from her family, and she felt compelled to frequently

rearrange her furniture.  (*Id.*)  The ALJ also considered the function report

completed by Plaintiff's husband, but did not give it great weight because he was

not a disinterested third party, his opinion was inconsistent with medical observations, and Plaintiff could attend to her personal needs and perform household chores.  (Tr. 20–21.)

The ALJ found it notable that Plaintiff alleged that her disability began on February 1, 2009, but she did not seek any treatment from November 2008 through October 19, 2009.  (Tr. 18.)  Then in October 2009, Plaintiff complained of frequent crying spells and isolating herself.  (*Id.*)  On examination at that time, she was easily distracted and exhibited a deficit in immediate recall.  (*Id.*)  She displayed poor insight, judgment, and impulse control, but her GAF score was 58, indicating moderate limitations in functioning.  (*Id.*)  The ALJ also noted that Plaintiff did not enter counseling until September 2010, when she complained of isolation, withdrawal, and irritability.  (*Id.*)  At that time, her speech was slow, her mood was depressed, and she displayed a blunted and flat affect.  (*Id.*)  The ALJ noted that in later treatment Plaintiff discussed feeling depressed and anxious, but her therapist did not describe any signs or symptoms consistent with disability.  (*Id.*)

The ALJ noted that Plaintiff sought treatment for depression and anxiety from Dr. James Wook Kim in March 2011.  (*Id.*)  At that time, her insight and judgment were fair, and her mental status examination was otherwise normal. (*Id.*)  Dr. Kim assessed a GAF score of 40, which the ALJ noted was "inconsistent with the few findings on examination."  (*Id.*)  A few months later, Plaintiff underwent a psychological examination with Certified Nurse Specialist

Linda Hertz. (*Id.*)  Hertz acknowledged Plaintiff's history of depression and anxiety, but she did not find any abnormalities during the examination.  (*Id.*)  And in subsequent treatment notes through September 2011, Hertz noted that Plaintiff was doing much better since resuming her medication.  (*Id.*)

Plaintiff next sought treatment in February 2012, several months after she ran out of her medications.  (*Id.*)  Her symptoms had increased but her thought process, attention, and concentration were intact.  (*Id.*)  The ALJ noted that at that time, although she had ongoing feelings of depression and anxiety, she had been able to coordinate moving her family to a new home.  (*Id.*)

The ALJ accepted Plaintiff's claim that she had a learning disability, and he limited her to simple, routine, repetitive tasks.  (Tr. 19.)  However, due to a lack of information about her learning disability, the ALJ did not find any additional limitations.  (*Id.*)

The ALJ acknowledged that Plaintiff's intermittent treatment might have been related to her moving multiple times, but he also noted that when she sought treatment and took her medication, her mood quickly stabilized and improved.  (*Id.*)  Conversely, when she ran out of medication, her mood deteriorated.  (*Id.*)  And even when her symptoms were active, she did not have signs and symptoms consistent with disability in the ALJ's opinion.  (*Id.*)  For example, when Plaintiff reported anxiety and difficulty sleeping in March 2012, she remained capable of finding a new home and moving her family.  (*Id.*)

The ALJ also considered the opinion evidence.  (*Id.*)  He gave limited weight to Dr. Andrew Thompson's opinion because it was based on a consultative evaluation that occurred three years before the alleged onset of disability.  (*Id.*)  He considered Dr. Lyle Wagner's July 5, 2011 opinion and gave it great weight.  (Tr. 19–20.) And he found that medical evidence submitted subsequent to Dr. Wagner's opinion demonstrated additional limitations in Plaintiff's social functioning.  (Tr. 20.)  The ALJ also considered Dr. Janis Konke's July 20, 2011 opinion, which was based solely upon her review of Plaintiff's medical records.  (Tr. 20.)  The ALJ found Dr. Konke's opinion to be consistent with the record, particularly Plaintiff's isolating behavior and memory deficit, and he granted her opinion great weight.  (*Id.*)

Ultimately, at step four of the disability determination procedure, the ALJ found that Plaintiff was capable of performing her past relevant work as a housekeeper.  (Tr. 21.)  Thus, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act, from February 1, 2009, through July 27, 2012, the date of the ALJ's decision.  (Tr. 21–22.)

## DISCUSSION

## I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.* (citing *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

In support of her motion for summary judgment, Plaintiff makes three arguments.  (Doc. No. 15, Pl.'s Mem.)  First, Plaintiff argues that the ALJ failed to

26

fully and fairly develop the record on medical equivalency.  She contends that an

updated opinion on medical equivalence should have been sought so that

Dr. Tinius's opinion about Plaintiff's borderline intellectual functioning could have

been taken into account along with Plaintiff's other severe impairments.  Second,

Plaintiff argues that in posing a hypothetical question to the vocational expert, the

ALJ failed to account for Plaintiff's absences from work due to migraines and

panic attacks, and failed to credit the vocational expert's testimony that Plaintiff's

carpal tunnel syndrome would prevent her from performing her past work.  Third,

Plaintiff argues that not only is she incapable of performing her past work as a

housekeeper, but she is also incapable of performing other jobs identified by the

vocational expert, including government clerk, surveillance system monitor, and

credit clerk.

### A.    Additional Evidence on Borderline Intellectual Functioning

### I.    Step 4:  Medical Equivalency

Dr. Tinius's opinion about Plaintiff's borderline intellectual functioning,

including the limitations on ability to understand, remember, and carry out

detailed instructions and other cognitive limitations, should be considered by the

ALJ in determining whether the Plaintiff's impairments, in combination, medically

equal the criteria contained in the Listings.  When he analyzed whether Plaintiff's

mental impairment caused any marked limitations the ALJ concluded that Plaintiff

only had a "moderate limitation" on her ability to sustain focused attention and

concentration sufficiently long enough to permit the timely and appropriate

completion of tasks commonly found in work settings.  (T. 16.)  Dr. Tinius's opinion, which was not available to the ALJ, is important in the determination of whether "claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06," including the "paragraph B" criteria. (*Id.*)

The record of the hearing shows that the ALJ recognized that IQ testing of the Plaintiff may be important because the ALJ noted that "Dr. Wagner suggested it might be helpful to have an IQ test performed."  (T. 48.)  But the ALJ conditioned the ordering of IQ tests on whether Plaintiff had attended special education as a child.  Plaintiff did not attend special education, although she did complete her schooling at a Learning Center where she took nonstandard courses with minimal academic challenge, so no IQ tests were ordered. Plaintiff's counsel apparently went ahead and had Dr. Tinius do the tests and submitted them to the Appeals Council.  Under the circumstances of this case, this Court concludes that as a result of Dr. Tinius's opinion, an updated medical equivalence should have been ordered in a remand to the ALJ by the Appeals Council because Dr. Tinius's opinion about the Plaintiff's borderline intellectual functioning and related cognitive limitations "may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairment."  (SSR 96-6p, at *4.)

## II.    Step 5: Residual Functional Capacity

The Commissioner acknowledges that Dr. Tinius diagnosed Plaintiff with borderline intellectual functioning, which is "a significant nonexertional impairment that must be considered by a vocational expert." (Def.'s Mem. 13 (quoting *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir. 1997)).) The vocational expert, Dr. Perry, did not have the benefit of Dr. Tinius's tests which showed Plaintiff's borderline intellectual functioning and, indeed, said that without I.Q. scores he could not testify about the effect Plaintiff's borderline intellectual functioning would have on Plaintiff's employment. (Tr. 46–49.) As noted above, the ALJ in the hypothetical assumed that Plaintiff had only "moderate" limitations on her ability to "understand, remember, and carry out detailed instructions, as well as in her ability to interact appropriately with the public and respond to criticism or instruction from supervisors." (Tr. 17.) The Commissioner asserts that the ALJ, nonetheless, adequately captured the concrete consequences of Plaintiff's borderline intellectual functioning by limiting her to "simple, routine, repetitive kinds of tasks." (Def.'s Mem. 14 (citing *Howard v. Massanari*, 255 F.3d 577, 583 (8th Cir. 2001)).) However, when the ALJ changed the hypothetical to include a marked limitation in regards to concentration, persistence, and pace that caused the worker to be unproductive for anywhere from fifteen minutes to a half an hour on pretty much a daily basis, the vocational expert said this would eliminate competitive employment including the Plaintiff's past work as a housekeeper. (Tr. 42–43.)

As noted above, the issue of Plaintiff's IQ scores arose at the administrative hearing.  Plaintiff's counsel asked the vocational expert about the reasoning level, as defined by the Dictionary of Occupational Titles, consistent with a person who had borderline intellectual functioning.  (Tr. 47.)  The vocational expert said he could not answer the question without knowing the person's specific IQ scores.  (Tr. 48.)  But, again as described above, no IQ tests were ordered by the ALJ.

"A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence."  *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) (citing *Hunt v. Massanari*, 250 F.3d 622, 625–26 (8th Cir. 2001)).  A claimant is entitled to have a vocational expert consider her impairment of borderline intellectual functioning when it is supported by the record.  *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996).  "[I]t is of no consequence whether the claimant's borderline intellectual functioning pre-dated her application; the vocational expert still must consider it along with the claimant's other impairments."  *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005) (citing *Pickney*, 96 F.3d at 297 n.3.)

Here, the ALJ limited Plaintiff to work involving simple, routine, repetitive tasks based on her self-report that she had a learning disability.  The ALJ, however, stated that he did not include any additional limitations in Plaintiff's RFC due to the paucity of evidence.  Dr. Tinius's report provides the type of evidence the ALJ was lacking in determining whether Plaintiff had any additional work

limitations.  For example, Dr. Tinius's report indicates that Plaintiff's verbal

comprehension fell within only the third percentile, and her sustained attention

and concentration on the Integrated Visual and Auditory ("IVA") continuous

performance test was in the severely impaired range, at the .2 percentile.

(Tr. 395–96.)  These test results might have caused the ALJ to find that Plaintiff

was more limited in her ability to follow instructions from supervisors, and in her

concentration, persistence, or pace on work tasks.

In *Grissom v. Barnhart*, the ALJ's RFC determination was inadequate

because a vocational expert had not clearly and directly assessed Grissom's

work abilities in light of her borderline intellectual functioning, her fair to poor

abilities to deal with stress and function independently, or to maintain

concentration and attention.  416 F.3d at 837–38.  On remand, the ALJ was

required to make further findings regarding whether Grissom's borderline

intellectual functioning prevented her from doing her past relevant work.  *Id.* at

838.  The same reasoning applies here.

The Commissioner contends this case is like *Howard v. Massanari*, 255

F.3d 577 (8th Cir. 2007).  (Def.'s Mem. 14.)  In *Howard*, the Eighth Circuit Court

of Appeals held that, based on a State agency psychological consultant's

opinion, the ALJ adequately captured the concrete consequences of the

claimant's borderline intellectual functioning by limiting her to simple, repetitive,

routine tasks.  255 F.3d at 582.  In *Howard*, however, the record before the ALJ

contained the claimant's intelligence test scores, resulting in the ALJ's finding

that the claimant had a severe impairment of borderline intellectual functioning. *Id.* at 579–80.  The state agency medical consultants who reviewed Howard's record, knowledgeable of his IQ scores, opined that Howard could perform simple, routine, repetitive work.  *Id.* at 580.  Thus, the ALJ's hypothetical question adequately captured the concrete consequences of Howard's borderline intellectual functioning because it was based on the state agency medical consultants' RFC opinions.

Here, however, Plaintiff's IQ test was performed after Drs. Konke and Alsdurf, the state agency consultants, reviewed Plaintiff's medical records and gave their RFC opinions.  Thus, the state agency consultants, in forming their RFC opinions, did not take into account Plaintiff's specific diagnosis of borderline intellectual functioning or other conclusions gleaned by Dr. Tinius from the results of Plaintiff's IQ test and other cognitive testing.

The weight an ALJ should give nonexamining physicians' opinions depends on "the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  The ALJ relied on medical opinions of nonexamining psychologists who were unaware of the results of Plaintiff's subsequent cognitive testing.  Therefore, substantial evidence on the record as a whole, including Dr. Tinuis's report, does not support the ALJ's decision.

On remand, the ALJ should first evaluate whether Plaintiff's borderline intellectual functioning, in combination with her other severe impairments, meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ should examine whether Plaintiff's mental impairments satisfy the "paragraph B" criteria.

 If the ALJ finds that Plaintiff does not meet a listed impairment, the ALJ should then take into account Plaintiff's borderline intellectual functioning, in combination with her other severe impairments, when determining Plaintiff's residual functional capacity at the fifth step of analysis.

### B.  Carpal Tunnel Syndrome, Migraines, and Anxiety Attacks

Finally, Plaintiff asserts that the ALJ failed to address Plaintiff's limitations due to carpal tunnel syndrome, migraines, and anxiety attacks.  (Pl.'s Mem. 16.) Plaintiff contends that these failures by the ALJ result in a record that is not fully and fairly development.  Based on the record as a whole, the ALJ correctly excluded migraines, anxiety attacks, and carpal tunnel syndrome from Plaintiff's severe limitations.

The medical evidence of record indicates that Plaintiff had a history of carpal tunnel release surgery (Tr. 302), but she was never evaluated or treated for hand or wrist pain during the relevant time period.  Furthermore, Plaintiff did not assert any physical limitations in support of her disability applications, nor did she testify about hand or wrist pain.  (Tr. 184–85, 304.)  Significantly, in June 2011, Plaintiff told Dr. Wagner that she was seeking disability due to mental

issues, and that she did not have any physical issues.  (Tr. 304).  Therefore, there was no basis in the record for the ALJ to find any limitations in Plaintiff's ability to use her hands.

Furthermore, although Plaintiff complained of daily headaches in October 2009 and December 2012 (Tr. 275, 292), she did not otherwise seek treatment for headaches.  *See Edwards v. Barnhart*, 314 F.3d 964, 867 (8th Cir. 2003) (stating that an ALJ may discount complaints of pain based on claimant's failure to pursue regular medical treatment).  In December 2012, Dr. Halfen opined that Plaintiff's headaches were not migraines, and treated her for nasal congestion. (Tr. 392).  The record as a whole does not support a finding that Plaintiff's headaches would limit her ability to perform basic work activities.

Finally, Plaintiff contends she would be absent from work due to anxiety attacks.  (Pl.'s Mem. 17-18).  Prior to September 2008, Plaintiff went to the emergency room four times due to chest pain, and she was diagnosed with anxiety attacks.  (Tr. 249).  While Plaintiff continued to suffer from generalized anxiety, there is no evidence that she suffered an anxiety attack after her alleged disability onset date of February 2009.  The record indicates that Plaintiff's anxiety attacks were successfully treated with medication.  (Tr. 249–50); *see Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (stating that an ALJ may properly conclude impairments that are amenable to treatment do not support disability).

### III.     Conclusion

This case should be remanded to the ALJ, (1) for an updated medical opinion based on Dr. Tinius's report and the record as a whole; (2) for the ALJ to reconsider whether Plaintiff met or equaled a listed impairment; and (3) for the ALJ to make a new RFC determination, if necessary, and determine whether Plaintiff can perform her past relevant work or any other work.

### RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 13), be **GRANTED** for remand pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation;

2.     Defendant's Motion for Summary Judgment (Doc. No. 17), be **DENIED**; and

3.     If this Report and Recommendation is adopted, that the case be dismissed and judgment entered accordingly.


Date: October 20, 2014          _s/ Jeffrey J. Keyes_____
                                JEFFREY J. KEYES
                                United States Magistrate Judge

**NOTICE**

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 3, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District court, and it is therefore not appealable to the Court of Appeals.